# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**JOSEPH E. WHITLEY, Guardian Ad Litem for M.P., a minor,**

   **Plaintiff,**

**vs.**             **No. CIV 00-1101 LCS**

**NEW MEXICO CHILDREN, YOUTH & FAMILIES DEPARTMENT; DEBORAH HARTZ, as Secretary of the New Mexico Children, Youth & Families Department and as an individual acting under color of state law; KAREN ZARATE, SUSAN W. DRAKE and CECILIA ROSALES, as individuals acting under color of state law and in their official capacity as employees of the New Mexico Children, Youth & Families Department; MESILLA VALLEY GENERAL PARTNERSHIP, a New Mexico general partnership d/b/a Mesilla Valley Hospital, MESILLA VALLEY MENTAL HEALTH ASSOCIATES, INC., a New Mexico corporation, as general partners of Mesilla Valley General Partnership, and all as persons acting under color of state law; JAIME MICHEL, M.D.; TOMMYE WILHITE, R.N., RUTH BURKHART, R.N.C.;CARLOS TRUJILLO, R.M.H.C.; and JOHN DOES I and II, as individuals acting under color of state law,**

   **Defendants.**

## MEMORANDUM OPINION AND ORDER

  **THIS MATTER** came before the Court on Defendant Deborah Hartz, Karen Zarate, Susan

W. Drake, Cecilia Rosales and Children Youth and Families Department's (hereinafter "Governmental

Defendants") Motion for Summary Judgment (Doc. 82), filed June 5, 2001. The United States

Magistrate Judge, acting upon consent and designation pursuant 28 U.S.C. § 636(c), and having

considered the pleadings, submissions, arguments of counsel, relevant law, and being otherwise fully

advised, finds that this Motion is well-taken and should be **GRANTED**.

## I.   Background.

Plaintiff brings this action on behalf of M.P., a minor child, seeking damages arising out of an incident where M.P. was sexually assaulted by another adolescent patient while housed at the Mesilla Valley Hospital (MVH) in Doña Ana County, New Mexico.  M.P. and her twin sister are two of six children born to their immediate family.  (Undisp. Fact No. 1.)  M.P., born on August 24, 1986, was twelve years old on the date of the alleged sexual assault.  (Am. Compl. ¶¶ 4-29.)  Joseph Whitley, Esq., was appointed as M.P.'s *guardian ad litem* during the course of abuse and neglect proceedings instituted in the Third Judicial District Court of the State of New Mexico with respect to M.P. and her siblings.  (Undisp. Fact No. 2.)

Defendant Children, Youth and Families Department (CYFD), an arm of the State of New Mexico, is charged with the protection of youth from parental abuse and neglect.  (Undisp. Fact No. 3.) Defendant Deborah Hartz has served as Cabinet Secretary for CYFD during all relevant times. (Undisp. Fact No. 5.)  Defendant Karen Zarate is CYFD's Doña Ana County Office Manager for its Protective Services Division.  (Undisp. Fact No. 6.)  Defendant Susan Drake is employed as a Social Work Supervisor II with the Las Cruces Office of CYFD's Protective Services Division.  (Undisp. Fact No. 7.)  Defendant Cecilia Rosales is employed as a Treatment Social Worker with the Las Cruces office of CYFD's Protective Services Division. (Undisp. Fact No. 8.)

M.P.'s mother placed M.P. and her siblings into CYFD custody in 1989.  (Undisp. Fact No. 16.)  CYFD retained custody of the children until March 19, 1990, when the family fled the area. (*Id*.)  From 1995 through 1997, M.P.'s family was referred to CYFD for physical neglect on several occasions.  (Undisp. Fact No. 18; Lucero Aff. ¶ 3.)  A referral in March 1997 led to a home visit by CYFD personnel Connie Lucero and Lydia Saenz that revealed extremely disgusting, unsafe and unfit

living conditions at the family home.  (Undisp. Fact No. 19; Lucero Aff. ¶¶ 4-13.)  Lucero observed that the children, especially M.P., engaged in alarming and aggressive behavior towards each other, as well as towards their mother and grandmother.  (Undisp. Fact No. 19; Lucero Aff. ¶ 13.)

In March 1997, M.P. was admitted to the Inpatient Acute Care Unit at the Mesilla Valley Hospital (MVH) due to self-destructive behavior, including physical assaults on her teachers and sexually inappropriate conduct with other students during school.  (Am. Compl. ¶ 17; Lucero Aff. ¶ 14.)  Near the time of her admission, M.P. was diagnosed as follows: Axis I, Oppositional Defiant Disorder, Dysthymia, General Anxiety Disorder; Axis II, Mild Mental Retardation; Axis III, Frontal Lobe Seizure Disorder; Axis IV, Stressors, 5 extreme; Axis V, current Global Assessment of Functioning (GAF) at 50.[1]  (Am. Compl. ¶ 18; Lucero Aff. ¶ 14.)  M.P. had been previously diagnosed with epilepsy.  (Am. Compl. ¶ 18.)

On March 25, 1997, M.P.'s mother was arrested and incarcerated for aggravated DWI.  (Undisp. Fact No. 22.)  The arrest, as well as the unsuitability of M.P.'s father and grandmother, prompted CYFD to initiate custody proceedings with respect to the children.  (*Id.*)  On May 2, 1997, M.P. and her siblings were placed in the custody of CYFD pursuant to a finding of abuse and neglect.  (Am. Compl. ¶ 16; Undisp. Fact No. 23.)

On September 13, 1997, M.P. was placed in a therapeutic foster home.  (Undisp. Fact No. 24.)  In December 1997, M.P. was moved to a different foster home due to her aggressive and defiant

---

[1]A GAF score is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning." *See* American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), (4th ed. 1994) at 30. The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *See id.* at 32.

behavior. (*Id.*) On January 12, 1998, an Individualized Education Program (IEP) meeting was called at M.P.'s middle school due to M.P.'s out-of-control and non-compliant behavior. (Undisp. Fact No. 25; Rosales Aff. ¶ 11.) School staff was concerned about M.P.'s inappropriate sexual behavior, stealing from others, and leaving the classroom without permission. (Rosales Aff. ¶ 11.) After the IEP meeting, CYFD reevaluated M.P.'s treatment program and recommended Homebound placement. (Undisp. Fact No. 25.)

On March 17, 1998, after she threatened her foster mother with a piece of glass, M.P. was placed the Acute Care Unit (ACU) of the MVH for stabilization. (Undisp. Fact No. 26; Rosales Aff. ¶ 12.) M.P. was later transferred to MVH's Residential Treatment Center (RTC). (Undisp. Fact No. 26.) On March 27, 1998, CYFD placed M.P. at Innovative Services, a group home, with her twin sister in an effort to maintain and monitor M.P. outside of the RTC setting. (Undisp. Fact No. 27.) On April 25, 1998, M.P. ran away from the group home to her mother's home. (Undisp. Fact No. 28.) M.P.'s mother called the police and M.P. was returned to CYFD custody. (*Id.*)

After a May 8, 1998, psychological evaluation revealed low functioning and multiple diagnoses, CYFD placed M.P. at the ACU of Alliance Hospital. (Undisp. Fact No. 29.) At Alliance, M.P.'s destructive and out-of-control behavior intensified and M.P. was restrained most of each day. (Undisp. Fact No. 30.) CYFD determine that Alliance lacked the ability to care for M.P., due to her limited cognitive abilities. (*Id.*) On May 27, 1998, CYFD placed M.P. at Innovative Services RTC program in Albuquerque, to determine whether her behavior would improve away from her twin. (Undisp. Fact No. 31.)

On August 26, 1998, CYFD moved M.P. from the Innovative Services RTC to Pinon Hills Hospital. (Undisp. Fact No. 33.) At that time, M.P. was diagnosed with Severe Attention Deficit

Hyperactivity Disorder, Mental Retardation, PTSD, ODD, Depressive Disorder and assessed a GAF score of 30.  (Rosales Aff. ¶ 19.)  In January 1999, M.P. was determined to be insufficiently stable to be considered as a group home candidate.  (Undisp. Fact No. 33.)

On March 5, 1999, a therapist at Pinon Hills advised Defendant Rosales that Alliance was attempting to establish a program to treat developmentally disabled children.  (Undisp. Fact No. 34; Rosales Aff. ¶ 23.)  On March 10, 1999, CYFD transferred M.P. from Pinon Hills to the Zia Program at Alliance after the Pinon Hills unit for adolescent girls closed.  (*Id.*)  M.P. was diagnosed with Axis I, Post Traumatic Stress Disorder Depression; Axis II, Mild Mental Retardation, Developmental Leaning Disorder; Axis III, No diagnosis; Axis IV, Recent change of residential treatment facilities, reestablishing relationship with motion; Axis V, current GAF of 30 to 40. (Rosales Aff. ¶ 24.)

On April 23, 1999, M.P. was transferred to the ACU at Alliance from the Alliance Zia Program due to her behavior of "screaming, yelling, having a very difficult time and creating a dangerous situation for the staff and herself."  (Rosales Aff. ¶ 27.)  During her stay in the Alliance ACU, M.P. continued being aggressive with staff and residents, tried to run away, and took her clothes off in front of others.  (*Id.*)  CYFD had specific concerns over Alliance's lack of treatment goals, lack of schooling, delays in implementation of a behavioral management program, excessive isolation, and over-use of chemical restraints.  (Undisp. Fact No. 36.)

On May 28, 1999, after continued disruptive conduct, M.P. was moved from Alliance's ACU to a specialized unit with two other children.  (Undisp. Fact No. 37.)  Alliance indicated that M.P. would not be returned to the Zia Program because she continually disrupted the treatment milieu. (*Id.*)  On June 14, 1999, CYFD notified Alliance with it would attempt to transfer M.P. to another facility.  (Undisp. Fact No. 38.)

5

On June 18, 1999 CYFD transferred Plaintiff to the ACU at MVH.  (Undisp. Fact No. 39.) M.P.'s placement at MVH was to be temporary because Children's Psychiatric Hospital was reviewing her for placement.  (Undisp. Fact No. 40.)  Defendant Drake emphasized to MVH staff that M.P. was not to see her twin who was housed in the RTC at MVH.  (*Id.*)  M.P. was placed in the ACU and not the RTC at MVH. (*Id.*)

CYFD's decision to move M.P. from Alliance to MVH's ACU was based upon knowledge from Defendant Rosales and Defendant Drake that M.P. was receiving deficient care at Alliance. (Undisp. Fact No. 42.)  MVH was the only treatment option given to CYFD by the Rio Grande Behavioral Health Organization (BHO).  (Undisp. Fact No. 43.)  The BHO authorized the placement of M.P. at MVH's ACU.  (Undisp. Fact No. 44.)

On June 19, 1999, M.P. reported to that she had been raped by P.M., a male adolescent patient at MVH.  (Compl. ¶ 29; Undisp. Fact No. 48.)  On June 22, 1999, Children's Psychiatric Hospital informed CYFD that it was not accepting new patients at that time. (Undisp. Fact No. 50.) M.P. remained at MVH until her transfer to Kaseman Presbyterian Hospital in Albuquerque on July 1, 1999. (Undisp. Fact No. 51.)

Once a child is placed in state custody, CYFD prepares a treatment plan that is submitted to the state district court for approval and remains in effect until modifications are approved by the state court.  (Undisp. Fact No. 53.)  The state court conducted periodic reviews at six month intervals. (Undisp. Fact No. 54.)  Defendants have submitted the treatment plans and periodic review reports under seal as Appendix 1.

On July 28, 2000, Plaintiff filed her original Complaint, alleging claims for violation of her civil rights under 42 U.S.C. § 1983 (Count I), conspiracy to violate her civil rights under 42 U.S.C.

§ 1985(3) (Count II), and supplemental state law claims for premises liability (Count III), negligence and negligence per se (Count IV), breach of duty to protect (Count V), and negligent supervision, negligent entrustment and negligent failure to warn (Count VI).

On October 2, 2000, the Governmental Defendants filed a Motion to Dismiss, asserting, *inter alia*, the defense of qualified immunity. (Doc. 29.)  After a hearing on the Motion to Dismiss, the Court granted Plaintiff leave to file an Amended Complaint, permitted Plaintiff to conduct limited discovery designed to meet the Governmental Defendants' assertion of qualified immunity, set deadlines for completion of the limited discovery, and issued a briefing schedule.  (Docs. 43; 50; 57; 79; 86.)

On February 16, 2001 Plaintiff filed a First Amended Complaint for Civil Rights Violations and Related Claims, (Doc. 44), asserting claims for damages and attorney fees due to violation of her civil rights under 42 U.S.C. § 1983 and 1988 against all Defendants (Count I), for damages under the Adoption Assistance and Child Welfare Act (AACWA), 42 U.S.C. § 671(a)(22), (a)(16) and 675 (1) & (5) against the Governmental Defendants (Count II), and for damages for supplemental state law claims for premises liability against the MVH Defendants, Ruth Burkhart and Dr. Michel (Count III), negligence and negligence per se against the MVH Defendants, Ruth Burkhart and Dr. Michel (Count IV), breach of duty to protect against all Defendants (Count V), and negligent supervision, negligent entrustment and negligent failure to warn against all Defendants (Count VI).

The Governmental Defendants (hereinafter "Defendants") answered the First Amended Complaint on March 19, 2001, (Doc. 58), and filed their Motion for Summary Judgment on June 5, 2001. (Doc. 82.)  In their Motion, Defendants argue that (1) they are entitled to qualified immunity, (2) that Plaintiff's AACWA claims are not cognizable, and (3) that the state tort claims should be

dismissed due to lack of federal jurisdiction and sovereign immunity.

## II.   Standard

A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Summary judgment is proper when the pleadings, depositions, answers to interrogatories and admissions on file, as well as any affidavits "show that there is no genuine issue as to any material fact." *Id.* When applying this standard, the Court examines the record and reasonable inferences in the light most favorable to the non-moving party. *See Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F. 3d 1321, 1326 (10th Cir. 1999).

The movant bears the initial burden of establishing that no genuine issue exists as to any material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (*quoting First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289 (1968)). The movant's initial burden may be discharged by showing there is an absence of evidence to support the non-moving party's case. *See Celotex v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets its burden, the burden shifts to the non-moving party to demonstrate a genuine issue for trial on a material matter. *See McGarry v. Pitkin Co.*, 175 F. 3d 1193, 1201 (10th Cir. 1999).

## III.   Analysis

### a.   Whether Defendant Hartz is entitled to summary judgment.

Defendant Hartz argues that she is entitled to judgment because she had no personal involvement in M.P.'s case. Supervisors are not liable under § 1983 for the acts of their subordinates

unless the plaintiff shows an affirmative link between the constitutional deprivation and the supervisor's personal participation, exercise of control or direction, failure to supervise, or actual knowledge and acquiescence. *See Worrell v. Henry*, 219 F. 3d 1197, 1214 (10th Cir. 2000); *Mitchell v. Maynard*, 80 F. 3d 1433, 1441 (10th Cir.1996); *Meade v. Grubbs*, 841 F. 2d 1512, 1527 (10th Cir.1988). Defendant Hartz, cabinet Secretary for CYFD, had no actual or personal knowledge of M.P.'s circumstances, did not make any decisions concerning M.P.'s treatment needs or placements, and did not participate in any decisions concerning M.P.'s treatment needs or placements. (Aff of D. Hartz ¶ 1.) Plaintiff does not dispute this showing and acknowledges that Defendant Hartz is not directly liable under § 1983. (Pl. Response to Government Defs.' Mot. for Summ. J. at 7-8.) Therefore, Defendant Hartz is entitled to summary judgment on Count I.

> **b. Whether Defendants Rosales, Drake, and Zarate are entitled to qualified immunity.[2]**

Under the doctrine of qualified immunity, governmental officials performing discretionary functions generally are shielded from liability for civil damages so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Tonkovich v. Kansas Bd. of Regents*, 159 F. 3d 504, 515 (10th Cir. 1998). In evaluating a claim of qualified immunity, the first question is whether the plaintiff has asserted a violation of a constitutional or statutory right. *See Saucier v. Katz*, 533 U.S. ____, 121 S. Ct. 2151, 2156, 63 U.S.L.W 3329 (2001); *Garramone v. Romo*, 94 F. 3d 1446, 1449 (10th Cir.1996). If the plaintiff has asserted a violation of a constitutional or statutory right, then the question becomes whether that right was clearly established such that a reasonable

---

[2] CYFD employee Bonnie S. Vehstedt was named as a Defendant in the original Complaint, (Doc. 1), but was not included in the First Amended Complaint. (Doc. 44.)

person in the defendant's position would have known that his conduct violated the right. *See Saucier*, 121 S. Ct. at 2159; *Garramone,* 94 F. 3d at1449 (*citing Siegert v. Gilley*, 500 U.S. 226, 231 (1991)).

Summary judgment motions involving a qualified immunity defense are determined somewhat differently than other summary judgment motions. *Romero v. Fay*, 45 F. 3d 1472, 1475 (10th Cir.1995). When a defendant raises qualified immunity on summary judgment, the burden shifts to the plaintiff to meet a strict two-part test. *Scull v. New Mexico*, 236 F. 3d 588, 595 (10th Cir. 2000); *Nelson v. McMullen*, 207 F. 3d 1202, 1206 (10th Cir. 2000). The first question is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the defendant's conduct violated a constitutional right. *See Saucier v. Katz*, 121 S. Ct. at 2156; *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *Siegert v. Gilley*, 500 U.S. at 231-33; *Romero v. Fay*, 45 F. 3d at 1475. In the course of determining whether a constitutional right was violated on the facts alleged, the Court may set forth legal principles that will become the basis for a holding that a right is clearly established, but the focus in the first inquiry is whether a constitutional violation has been alleged. *See Saucier v. Katz*, 121 S. Ct. at 2156.

If a constitutional violation has been alleged based on a favorable view of the parties' submissions, the next sequential step is to ask whether the right that the defendant allegedly violated was clearly established at the time of the conduct at issue. *See Saucier v. Katz*, 121 S. Ct. at 2156; *Wilson v. Layne*, 526 U.S. at 603*; Albright v. Rodriguez*, 51 F. 3d 1531, 1534-35 (10th Cir.1995). In determining whether the right was "clearly established," the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether "the right [was] sufficiently clear that a reasonable [state actor] would understand that what he is doing violates that

right." *Wilson v. Layne*, 526 U.S. at 615; *see also Saucier v. Katz*, 121 S. Ct. at 2156.  If, and only if, the plaintiff establishes both elements of the test does the defendant then bear the traditional burden of showing "that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Albright*, 51 F. 3d at 1535.

Following the sequential approach, the first question is whether, taken in the light most favorable to Plaintiff, the facts alleged show Defendants' conduct violated a constitutional right.  *See Saucier v. Katz*, 121 S. Ct. at 2156.  Plaintiff alleges that Defendants are liable because they placed M.P. at MVH and thereby allowed another patient to rape her.  At this point, it is appropriate to define the constitutional right in question. *See id.*

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. Am. XIV.  Plaintiff invokes the substantive rather than the procedural component of the Due Process Clause by alleging that the state was obligated to protect M.P. under the circumstances.  *See DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 195 (1989) (*citing Youngberg v. Romeo*, 457 U.S. 307, 309 (1982)).  The Due Process Clauses generally confers no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual, and the State's failure to protect an individual against private violence generally does not constitute a violation of the Due Process Clause. *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U. S. at 195.

Accordingly, state actors are not generally liable for the violent acts of third parties.  *Liebson v. N.M. Corr. Dep't*, 73 F. 3d 274, 276 (10th Cir. 1996) (*citing Uhlrig v. Harder*, 64 F. 3d 567, 572 (10th Cir.1995)).  However, the Tenth Circuit has recognized two exceptions to this general rule.

*Uhlrig v. Harder*, 64 F. 3d at 572.  One of the exceptions, referred to as the "danger creation" theory, provides that a state may be liable for an individual's safety "if it created the danger that harmed the individual . . ." *Id*.  Although Plaintiff does not expressly assert either theory, the elements of the danger creation theory are neither alleged nor argued.  *See, e.g. Armijo v. Wagon Mound Public Schs.*, 159 F. 3d 1253, 1260 (10th Cir.1998) (elements of danger creation theory are (1) Plaintiff was a member of a limited and specifically definable group; (2) Defendant's conduct put Plaintiff at substantial risk of serious, immediate, and proximate harm; (3) the risk was obvious or known; (4) Defendant acted recklessly in conscious disregard of that risk; (5) such conduct, when viewed in total, is conscience shocking and (6) defendant actors created the danger or increased the plaintiff's vulnerability to the danger in some way).  Thus, Defendants cannot be liable for the acts of third parties through the danger creation theory.

The second exception, known as the "special relationship" doctrine, "exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual . . . ." *Uhlrig v. Harder*, 64 F. 3d at 572.  The state has a special relationship with "individuals depend[ent] completely on the state to satisfy their basic human needs." *DeAnzona v. Denver*, 222 F. 3d 1229, 1234 (10th Cir. 2000); (*quoting Maldonado v. Josey*, 975 F. 2d 727, 732-33 (10th Cir.1992)).  The Tenth Circuit has recognized prisoners, individuals committed against their will to mental institutions, and children in state run foster care as having a special relationship with the state. *DeAnzona v. Denver*, 222 F. 3d at 1234.  This affirmative duty to protect arises from the limitation which the state has imposed on the child's freedom to act on her own behalf. *DeShaney*, 489 U.S. at 199-200.

In this case, it is undisputed that the State of New Mexico, through CYFD, had been awarded

12

legal and physical custody of M.P. during the relevant period.  Because the state had legal and physical custody of M.P. at the time of the incident, Defendants may be liable for the acts of third parties under the special relationship doctrine.  *See DeAnzona v. Denver*, 222 F. 3d at 1234.  Thus, my analysis will proceed under that doctrine.

Children in foster care have a substantive due process right under the Fourteenth Amendment to be reasonably safe from harm by state officials such as social workers. *Yvonne L.,By and Through Lewis v. N.M. Dep't of Human Servs.*, 959 F. 2d 883, 893-94 (10th Cir. 1992).  If the responsible state social workers knew of the asserted danger to the child, or failed to exercise professional judgment with respect to the child, and if an affirmative link to the injury may be shown, then the state actors violated the child's constitutional rights.  *Id*., 959 F. 2d at 890 and 893-894.  Thus, in order to hold the social workers liable, Plaintiff must demonstrate that the social workers knew of the asserted danger to plaintiff or failed to exercise professional judgment, that is, that they abdicated their duty to act professionally, thereby causing injury.  *Id.*

In formulating the *Yvonne L.* standard, the Tenth Circuit relied upon the Supreme Court's decisions in *Youngberg v. Romeo*, 457 U.S. at 324 (developmentally disabled persons committed to state custody have a substantive due process right to reasonable care and safety) and *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U. S. at 199-200 (holding that when the State takes a person into custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being). Additionally, the *Yvonne L.* panel relied upon three Circuit opinions to support its conclusion that there was a clearly established right to reasonable safety while in foster care.  *See Doe v. New York City Dept. of Social Servs.*, 649 F. 2d 134 (2d Cir. 1981) (holding that a child in state custody has

a right to not be placed in a environment known to be unsafe); *K. H. v. Morgan*, 914 F. 2d 846, 853 (7th Cir. 1990) (holding that foster children have a constitutional right not to be placed with a foster parent who the social workers and supervisors know or suspect is likely to abuse or neglect the foster child); *Taylor ex rel. Walker v. Ledbetter*, 818 F. 2d 791 (11th Cir. 1987) (en banc) (same).

Based on a careful reading of *Yvonne L.*, it is clear that the annunciated standard is not the same as that required to show negligence.[3]  *See Yvonne L.*, 959 F. 2d at 893-94.  For instance, the Tenth Circuit stated that "'[f]ailure to exercise professional judgment' does not mean mere negligence as we understand" and expressed "doubt" as to whether there was much difference between the standard as applied in the foster care setting and "deliberate indifference."[4] *Id.* at 894.  Deliberate indifference requires more than an ordinary lack of due care.  *See County of Sacramento v. Lewis*, 523 U.S. at 848-849 (stating that "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process"); *see also Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (holding that deliberate indifference applies to claims under the Eighth Amendment).  Consequently, I find that the *Yvonne L.* standard is unrelated to professional malpractice and does not require expert testimony to establish a standard of care.  *But c.f. T.M. v. Carson*, 93 F. Supp. 2d 1179 (D. Wyo. 2000).

---

[3]  A number of cases discuss the professional judgment standard through comparison to a "culpability spectrum"of negligence, gross negligence and deliberate indifference.  *See, e.g. County of Sacramento v. Lewis*, 523 U.S. 833, 848-849 (1998); *Shaw by Strain v. Strackhouse*, 920 F. 2d 1135, 1146-47 (3rd Cir. 1990); *T.M. v. Carson*, 93 F. Supp. 2d 1179 (D. Wyo. 2000).

[4]  Deliberate indifference, in the context of the Eighth Amendment, requires a showing that the official knew of and disregarded an excessive risk of health or safety.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  The official must both be aware of the facts from which an inference could be drawn that a substantial risk of serious harm exists and must also draw the inference.  *Id.*

In *Yvonne L.*, the Tenth Circuit held that children in state foster care have a right to reasonable protection from physical harm and that state officials who place the children are shielded from liability unless the plaintiff demonstrates that the officials failed to exercise professional judgment by abdicating[5] their duty to act professionally in making the placement.[6] *Yvonne L.* at 893-894.  In order to hold Defendants liable, Plaintiff must demonstrate that they (1) knew of the asserted danger to M.P., or (2) failed to exercise professional judgment, that is, that they abdicated their duty to act professionally, thereby causing the M.P.'s injuries.  *Yvonne L.*, 959 F. 2d at 890 and 893-94.

I view the professional judgment aspect of this standard as equivalent to the actual knowledge aspect.  In *Yvonne L.*, the Tenth Circuit expressed "doubt" as to whether there was much difference between the professional judgment standard and deliberate indifference when applied in the foster care setting.  *Yvonne L.*, 959 F. 2d at 894.  Deliberate indifference is a stringent standard of fault, requiring that a state actor disregarded a known or obvious consequence of her action.  *See Bd. of County Comm's of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 410 (1997).  Deliberate indifference requires a showing that the official knew of and disregarded an excessive risk of health or safety to the claimant.  *See Farmer v. Brennan*, 511 U.S. at 837.  The official must both be aware of the facts from which an inference could be drawn that a substantial risk of serious harm exists and

---

[5]  The act of abdicating is defined as "giving up . . . authority . . . or trust. BLACK'S LAW DICTIONARY, 17 (rev. 4th ed. 1968) (*citing McCormick v. Engstrom*, 119 Kan. 698, 241 P. 685, 688 (1925).  "Abdicate" implies a giving up of sovereign power or an evading of responsibility, such as that of a parent. WEBSTER'S COLLEGIATE DICTIONARY, 2 (10th ed. 1995)

[6]  At another point in *Yvonne L.*, the Tenth Circuit stated that if the responsible officials "place children in a foster home or institution that they know *or suspect* to be dangerous to the children they incur liability if the harm occurs." *Yvonne L.*, 959 F. 2d at 893 (*emphasis added*).  I find that this statement is dicta made in the context of determining whether the right was *clearly established* and is not a correct statement of the Court's holding as to that standard.

she must also draw the inference. *Id.*   Therefore, in my view, Plaintiff must establish that 1) Defendants consciously disregarded a known or obvious risk to M.P.'s safety or 2) Defendants abdicated their duty to act professionally, thereby causing M.P. harm.  *Yvonne L.*, 959 F. 2d at 890 and 893-94.

Now that the standard has been defined, the analysis of whether Plaintiff has satisfied his burden on qualified immunity may proceed.  Following the sequential approach, the first question is whether, taken in the light most favorable to Plaintiff, do the facts alleged show Defendants' conduct violated a constitutional right.  *See Saucier v. Katz*, 121 S. Ct. at 2156.  Plaintiff alleges that, knowing of her vulnerable psychological condition and tendency to act out sexually, Defendants placed her at MVH despite their knowledge that the facility was unsafe based on (1) prior complaints regarding the safety of MVH and its non-compliance with state and federal law and applicable industry rules, regulations and standards; (2) inadequate quantity and quality of staffing; (3) inadequate monitoring and supervision of residents and staff; (4) inadequate security; (5) failure to screen and isolate residents posing a treat to others; (6) inadequate formulation of policy and standards providing for the safety and well-being of residents; and (7) failure to apply policy and standards formulated for the safety and well-being of residents. (Am. Compl. ¶¶ 42-48.)

For the purposes of the initial qualified immunity inquiry, the parties' submissions must be taken in the light most favorable the plaintiff.  *Saucier*, 121 S. Ct. at 2156.  Plaintiff has alleged facts indicating that Defendants knew that M.P.'s mental condition rendered her vulnerable to assaults from other residents and that Defendants knew of serious deficiencies in screening, supervision and monitoring at MVH that could compromise M.P.'s safety and that Defendants failed to exercise professional judgment with respect to M.P's placement at MVH.  Taken in the light most favorable

16

to Plaintiff, the facts alleged show that Defendants' conduct violated M.P.'s constitutional right to be kept reasonably safe from harm while state custody.  Thus, Plaintiff has satisfied the first half of his burden in response to Defendants' assertion of qualified immunity.

The second aspect of the qualified immunity inquiry is whether, in June 1999, the constitutional right in question right was sufficiently clear that reasonable persons in Defendants' positions would understand that their conduct, as alleged by Plaintiff, violated that right.  *See Wilson v. Layne*, 526 U.S. at 615; *see also Saucier*, 121 S. Ct. at 2156.  In 1982, the Supreme Court held that developmentally disabled persons committed to state institutions have a substantive due process right to reasonable care and safety.  *Youngberg*, 457 U.S. at 324.  In 1992, the Tenth Circuit held children in state foster care had a right not to be placed in known danger and to the exercise professional judgment with respect to their placement.  *Yvonne L.*, 959 F. 2d at 890.

As of 1999, Supreme Court and Tenth Circuit authority clearly alerted persons in the positions held by Defendants that a child in state custody had a constitutional right to be reasonably safe from harm and that if Defendants placed such a child in known danger, or failed to exercise professional judgment by abdicating their duty to act professionally, thereby causing injury to the child, they would violate the child's constitutional rights.  At the time of the incident, the law was sufficiently clear that reasonable CYFD employees, in Defendants' positions, would understand that what they were doing violated the child's constitutional right to be kept reasonably safe from harm, if Defendants in fact acted in conformity with the allegations of the Amended Complaint.  Plaintiff has satisfied both aspects of his initial burden with respect to Defendants' assertion of qualified immunity.

Defendants thus assume the traditional summary judgment burden of showing "that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law."

*Albright*, 51 F. 3d at 1535.

In Response, Plaintiff has submitted, *inter alia*, the Rule 56(f) Affidavit of his counsel, Joey B. Wright, that Plaintiff would require, based upon potential expert witness recommendations, the following discovery to establish a baseline of standard regarding the exercise of professional judgment: (A) CYFD Social Services Policy and Procedures Manual; (B) Medicaid care standards for Developmentally Disabled adolescents; (C) Medicaid care standards for Mentally Disabled adolescents; (D) CYFD and New Mexico Department of Health Incident Management Policies; and (E) New Mexico Department of Health and Medicare incident reports relating to M.P. and MVH. (Wright Aff. ¶ 2.)

Plaintiff's request for Rule 56(f) relief is untimely.  Defendants raised the issue of qualified immunity in a Motion to Dismiss served on October 2, 2000.  (Doc. 26.)  In his Response to the Governmental Defendants' Motion to Dismiss, Plaintiff argued, *inter alia*, that he required discovery to adequately refute the Motion pursuant to FED. R. CIV. P. 56(f) and attached the Affidavits of Joey B. Wright and Joseph E. Whitley.  (Doc. 31.)  On February 5, 2001, the Court held a hearing on the Motion to Dismiss and the Governmental Defendants' Motion to Strike Affidavit of Joseph E. Whitley. (Doc. 41.)  At the hearing, I admonished Plaintiff that Rule 56(f) required that he "precisely identify, with great specificity, exactly the discovery needed to meet the issue of qualified immunity." (Transcript of Feb. 5, 2001 Hearing at 5.)  I informed Plaintiff that I would permit him to conduct discovery necessary to meet the motion and allow him to file an amended complaint.  On the same day, I issued an Order staying general discovery, requiring the parties to provide initial disclosures, requiring Plaintiff to precisely identify what discovery he needed to meet the assertion of qualified immunity by February 16, 2001, and setting a discovery planning conference to delimit the scope of

18

discovery necessary to meet the Motion to Dismiss for February 20, 2001.  (Doc. 43.)  My Order of February 5, 2001 also allowed Plaintiff to file an amended complaint by February 16, 2001 and set a time-table for response to the amended complaint.  (*Id.*)

At the February 20, 2001 discovery planning conference, the parties stated that they had reached an agreement as to most of the discovery requested and had agreed that the Governmental Defendants designate a Rule 30(b)(6) designee for deposition. (Doc. 46.)  Plaintiff requested that he be permitted to take additional depositions and obtain the documentary evidence requested in his Rule 56(f) affidavit. (Docs. 46, 50.)  On February 21, 2001, I issued an Order requiring Defendants to name a Rule 30(b)(6) designee, allowing Plaintiff to depose such designee and Defendant Zarate, but barring all other depositions.  (Doc. 50.)  My February 21, 2001 Order generally granted Plaintiff's request for documentary discovery as described in the Rule 56(f) affidavit, subject to any limitations on scope to be negotiated by counsel.  I further stated that "[i]f counsel are unable to so agree, they may petition the Court for further relief."  (Doc. 50, ¶ 5.)  The scope of initial discovery was limited to the acute care facility, until such time as Plaintiff reviewed Defendant's motion for summary judgment.  (Doc. 50, ¶ 7.)  I further stated that "[i]f Plaintiff believes that discovery of information regarding matters outside the scope of the acute care facility is required, Plaintiff may petition the Court for further relief."  (*Id.*)  Plaintiff did not request additional discovery before filing his Response with its attached Rule 56(f) affidavit.

If Plaintiff required additional discovery to meet Defendants' assertion of qualified immunity, he should have petitioned the Court for relief.  Defendants raised the issue of professional judgment in their Motion to Dismiss.  Indeed, Plaintiff recited the *Yvonne L.* standard in his Amended Complaint.  Any need for an expert witness was well-known to Plaintiff no later than February 2001.

The Court repeatedly admonished Plaintiff that if additional discovery was required, he should petition the Court.  Despite these warnings, Plaintiff failed to petition the Court for additional discovery until he attached a *second* Rule 56(f) affidavit to his Response to Defendant's Motion for Summary Judgment.  Plaintiff has been dilatory in his request for more discovery.  Moreover, I have determined that expert witness testimony is not relevant to the professional judgment analysis.  *See supra* text accompanying notes 2-3.  Under these circumstances, Plaintiff's request for relief under Rule 56(f) will be denied.

Additionally, in support of his Response, Plaintiff has submitted copies e-mails, memoranda, progress notes and physician's orders that are unsupported by affidavit.  (Pl. Ex. 1-16.)  Rule 56 provides that a court must consider "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any . . ."  *See* FED. R. CIV. P. 56 (c).  Only admissible evidence may be considered by a court when ruling on a motion for summary judgment. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F. 2d 1467, 1474 (10th Cir. 1985).  To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence.  *See IBP, Inc. v. Mercantile Bank of Topeka*, 6 F. Supp. 2d 1258, 1263 (D. Kan. 1998); 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 2722 at 384 (3d ed.1998).  Any affidavits submitted under Rule 56(e) must be based on personal knowledge, set forth such facts as would be admissible in evidence, and affirmatively show that the affiant is competent to testify as to the subject matter.  *See* FED. R. CIV. P. 56 (e).  Materials that do not measure up to the standards of Rule 56 are subject to a motion to strike.  *See Noblett v. General Elec. Credit Corp.*, 400 F. 2d 442, 445 (10th Cir.1968).

20

In their Reply Brief in Support of Motion for Summary Judgment, Defendants move to strike Plaintiff's Exhibits 1, 5-8, 9-11 and 13-16.   Plaintiff's Exhibit 1 is an internal CYFD e-mail dated March 4, 1999 concerning prior misconduct by a MVH RTC staff member who also worked in the adult unit.  (Pl. Ex. 1.)  Plaintiff's Exhibits 5-8 are internal CYFD e-mails concerning the sexual assaults of male RTC patients by another male RTC patient in February 1999. (Pl. Ex. 5-8.) Plaintiff's Exhibits 9-11 are medical records of M.P.'s 1997 stay at MVH indicating that she exhibited sexualized behavior and sexually acted out, that M.P. reported that a male peer crawled under her blanket and tried to touch her breast, and that these incidents were reported to Connie Lucero of CYFD.  (Pl. Ex. 9-11.)  Plaintiff's Exhibit's 13-16 concern  a gang-related assault on M.P.'s twin sister (whose initials are also "M.P.") while the sister was housed in the MVH RTC in January 1999. (Pl. Ex. 13-16.)  None of these materials has been authenticated by nor attached to affidavits, and there has been no showing as to admissibility.

Under Rule 56, memoranda and records that have not been authenticated are not admissible on summary judgment. *See Rill v. Trautman*, 950 F. Supp. 268, 269 (E.D. Mo. 1996).  Although such deficiencies are subject to waiver, Defendants have timely objected to Plaintiff's Exs. 1, 5-8, 9-11, and 13-16. *See Michigan State Podiatry Ass'n v. Blue Cross & Blue Shield of Michigan*, 681 F. Supp. 1239, 1243 (E.D. Mich. 1987).  Because they do not comply with the requirements of Rule 56, and opposing parties have raised timely objections, Plaintiff's Exhibits 1, 5-8, 9-11, and 13-16 as submitted should not be considered by the Court in the summary judgment determination.  However, in an abundance of caution, and because their inclusion does not alter the outcome of the analysis, the Court will consider Plaintiff's Exhibits 1, 5-8, 9-11, and 13-16.

Plaintiff's Exhibits 2-4 and 12 also fail to comply with Rule 56.  However, Defendants have

not moved to strike these exhibits. If unchallenged by the opposing party, unauthenticated or otherwise inadmissible evidence may be considered by the Court. *See H. Sand & Co. v. Airtemp Corp.*, 934 F. 2d 450, 454 (2d Cir. 1991). Because Defendants have not challenged Plaintiff's Exhibits 2-4 and 12, the Court will consider these exhibits as well.

In order to hold Defendants liable, Plaintiff must demonstrate that they either (1) knew of the asserted danger to M.P., or (2) failed to exercise professional judgment, that is, that they abdicated their duty to act professionally, thereby causing the M.P.'s injuries. *Yvonne L.*, 959 F. 2d at 890 and 893-94.

Defendants have submitted evidence establishing that they had no actual knowledge of any facts suggesting that MVH posed any type of danger to M.P. in June 1999. There is no indication that Defendants knew P.M. was a rapist, or that there had been any prior incidents of sexual assault among the ACU patients in June 1999. Defendants have discharged their initial burden by showing that there is an absence of evidence to support Plaintiff's due process claim with respect to actual knowledge. *See Celotex*, 477 U.S. at 323. Plaintiff failed to come forward with any evidence showing that Defendants had actual knowledge that M.P. would be harmed by her placement at the MVH. Because there is an absence of evidence that any Defendants had actual knowledge of danger to M.P., the next question is whether Defendants failed to exercise professional judgment, that is, whether they abdicated their duty to act professionally.[7]

Defendants argue that the MVH ACU was separate and distinct from the MVH RTC.

---

[7] In at least one case applying *Yvonne L.*, the issue of whether Defendants were acting as professionals was disputed. *See Bailey v. Pacheco*, 108 F. Supp. 2d 1214 (D. N.M. 2000). Because Plaintiff herein does not dispute that Defendants were acting as professionals, it is not necessary to analyze this issue.

Defendants acknowledge that they were aware of problems with the MVH RTC, but not of any problems with the ACU.  Defendants assert that for the purposes of their placement decisions, CYFD considered the MVH ACU to be a completely separate and distinct entity from the MVH RTC.  In support of this assertion, Defendants have submitted evidence to establish the following: the ACU and the RTC were housed in separate buildings; had separate nursing staff; had separate nurse managers; aspired to different treatment purposes and goals; utilized separate treatment milieu; had separate budgets; and were licensed by different agencies. (Affidavit of Ron Mays and Deposition of Karen Zarate.)

Plaintiff disputes that the MVH ACU was separate from the RTC, arguing that the staff was utilized interchangeably, that as far as Ms. Zarate knew the two units had the same management personnel, and that prior to May 1999, the two units did not have separate nurse managers. (Pl. Response to Government Defs.' Mot. for Summ. J. ¶ 2.)  In support of this assertion, Plaintiff has submitted an internal CYFD e-mail that a MVH employee had sex with an adult patient and that this employee floated between the adult unit and the RTC.  (Pl. Ex. 1.)  Plaintiff also relies on Defendant Zarate's deposition testimony that the RTC and ACU may not have had separate management staff. (Zarate Deposition at 112-113.)  However, it is undisputed that the units had separate nurse managers in June 1999, when the incident occurred.  (Pl. Exs. 3 and 4.)

Defendants have submitted evidence demonstrating that the ACU was separate from the RTC for placement purposes.  In response to this showing, Plaintiff has failed to come forward with evidence that the units were the same entity.  The Court finds that the ACU was separate from the RTC for placement purposes and that Defendants were entitled to focus on their knowledge of the safety status of the ACU when considering M.P.'s placement.

Defendants have submitted evidence that the ACU was a safe facility based on the following factors; the ACU had never been restricted from receiving new patients from CYFD; the ACU had not received any deficiency reports; the ACU did not have any incidents of patients engaging in sexual intercourse; and the ACU was in good standing with the New Mexico Department of Health, the agency charged with monitoring and licensing the ACU. (Affidavits of Ron Mays, Fred Gallagher, Richard Malcolm and the Deposition of Karen Zarate.) Plaintiff does not dispute that MVH's ACU had not been under restriction or that the ACU had no reports of involuntary intercourse. (Pl. Response to Government Defs.' Mot. for Summ. J. ¶¶ 3-4.) Based on this record, Defendants' decision to place M.P. at the MVH ACU in June 1999 was a valid exercise of professional judgment. Plaintiff has failed to establish that Defendants abandoned their duty to act professionally when they placed M.P. at the MVH ACU.

Even if I considered the ACU and the RTC as a single entity, I would still be unable to find that Defendants relinquished their duty to act professionally. To counter Defendants' assertion that the MVH ACU was safe, Plaintiff has submitted internal CYFD e-mails concerning sexual assaults on two male patients by another male patient at the MVH RTC in February 1999, (Pl. Ex. 5-7), and an e-mail establishing that Zarate and Drake were aware of this incident. (Pl. Ex. 8.) Plaintiff has also submitted medical records documenting M.P.'s involvement in sexual incidents during her 1997 stay at MVH. (Pl. Exs. 9-11.) Additionally, Plaintiff relies on evidence indicating that Defendant Zarate knew that M.P.'s sister had been initiated into, and ousted from, a gang while she was housed at the MVH RTC in January 1999. (Pl. Exs. 13-16.) Indeed, Defendants acknowledge that they were aware of problems at the MVH RTC.

In light of these problems at the MVH RTC, a professional social worker may well have

decided against placing M.P. in the MVH ACU. However, that is not the inquiry.[8]  Under *Youngberg*

and *Yvonne L.*, the due process issue is not a question of negligence or malpractice; resolution rests

on whether there was an abdication of duty, not whether there was a breach of a standard of care.

It is not appropriate for the Court to determine which of several professionally acceptable choices

should have been made. *Bailey v. Pacheco*, 108 F. Supp. 2d at 1221.  The key question is whether

Defendants abdicated their duty to act professionally.  *Yvonne L.*, 959 F. 2d at 893-94.  Based on all

the evidence in the record, Plaintiffs have failed to meet this formidable standard.  Defendants did not

abandon this duty with respect to placing M.P. at MVH.

 Plaintiff asserts that Defendants failed to monitor and correct deficiencies after the incident.

Defendants have submitted evidence that they worked diligently to find an alternative placement for

M.P. after the incident, assisted with the criminal investigation, and advocated for improvements in

M.P.'s treatment.  (Drake Aff. ¶¶ 19-55, Rosales Aff. ¶¶ 32-39, and Zarate Aff. ¶¶ 15-47.)  M.P. was

transferred to Kaseman Presbyterian Hospital on July 1, 1999. (Undis. Fact No. 51.)  Plaintiff

disputes that CYFD remained closely involved in the investigation into the allegations and M.P.'s

treatment after the rape and attempted to find an alternative placement, but offers no evidence in

support of this assertion.  Based on the evidence of the record, Defendants did not abdicate their duty

to act professionally with respect to M.P. in the aftermath of the alleged sexual assault.

 Defendants have submitted evidence that they exercised professional judgment in placing M.P.

---

 [8]As more fully discussed *supra* at test accompanying notes 2-3, Plaintiff argues that expert testimony is required to establish a baseline of professionally accepted minimum standards, relying on *T.M. v. Carson*, 93 F. Supp. 2d 1179 (D. Wyo. 2000).  *T.M.* is neither controlling, nor compelling. The inquiry is whether there was a failure to act professionally, not whether there was a departure from a standard of care.  Because there is no need to establish a standard of care, expert testimony is not necessary.

at the MVH in June 1999, and that they exercised professional judgment in the aftermath of the alleged sexual assault.  Defendants have met their burden of establishing that no genuine issue exists as to any material fact.  *See Adickes*, 398 U.S. at 157.  The burden then shifted to Plaintiff come forward with evidence demonstrating a genuine issue for trial on a material matter.  *See McGarry v. Pitkin Co.*, 175 F. 3d at 1201.  The material question is not whether other professional social workers might disagree with Defendants' decision, but whether Defendants abandoned their duty to act professionally.  Plaintiff had the burden to come forward with evidence that Defendants failed to act in a professional manner, but he has failed to satisfy his burden.  Plaintiff has not raised an issue of material fact in this regard.  Based on the evidence presented, Defendants exercised professional judgment in placing M.P. at MVH in June 1999, and in the aftermath of the assault, and did not abdicate their duty to act professionally.  Thus, Defendants are entitled to qualified immunity with respect to Plaintiff's §1983 claims.

Defendants further argue that they are entitled to immunity because MVH was the only alternative offered to them by Rio Grande Behavioral Health Organization, M.P.'s Medicaid mental health care coordinator.  (Def. Undisp. Facts No. 9, 10, 11 and 43.)  While Plaintiff does not dispute that MVH was the only placement option available to Defendants, Plaintiff does assert that adequate, untapped funds were available for additional treatment options due to M.P.'s dual disability.  Plaintiff asserts that CYFD failed to timely obtain a dual disability waiver for M.P. from the Department of Health, which would have allowed additional funding for her treatment.  (Pl. Response to Government Defs.' Mot. for Summ. J. ¶ 8; Pl. Ex. 8, 9 and 16.)  Such a waiver was subsequently granted to M.P.

Good faith immunity bars liability if professionals were unable to satisfy their normal

professional standards because of budgetary constraints.  *Youngberg*, 457 U.S. at 323; *Bailey v. Pacheco*, 108 F. Supp. 2d at 1221.  Although budgetary constraints have been considered by the Courts, single option constraints have not.  *But c.f. Bailey v. Pacheco*, 108 F. Supp. 2d at 1238 (equating financial constraint with only available placement option situation).  The only authority that discusses this issue at least tangentially is *Bailey*.  Although I find the evidence is uncontroverted that Defendants had only one placement option, I need not reach the "single placement option" issue because I find that Defendants did not abdicate their duty to act professionally.

  **c. Whether Plaintiff's AACWA claims are cognizable.**

  The Governmental Defendants assert that Plaintiff's AACWA claims are not cognizable. In Count II, of the Amended Complaint, Plaintiff asserts that Defendant Hartz violated 42 U.S.C. § 671 (a)(22) of the AACWA by failing to "implement and enforce on or after January 1, 1999, standards to assure the safety and health of children such as M.P. who are provided services by public or private agencies while in a situation such as M.P.'s placement for care at MVH."  (Am. Compl. ¶ 50.) Plaintiff further alleges that Defendants Zarate, Drake and Rosales violated 42 U.S.C. §§ 671 (a)(16) and 675(1) and (5) by failing "to implement and enforce and appropriate case plan and case review system for M.P. consistent with the provisions of the Adoption Assistance and Child Welfare Act of 1980 and the regulations enacted thereunder." (Am. Compl. ¶ 51.)

  The relevant portions of § 671(a) provide:

> **(a) Requisite features of State plan**
> In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which  . . .
> (16) provides for the development of a case plan (as defined in section 675(1) of this title) for each child receiving foster care maintenance payments under the State plan and provides for a case review system which meets the requirements described in section 675(5)(B) of this

title with respect to each such child.
(22) provides that, not later than January 1, 1999, the State shall develop and implement standards to ensure that children in foster care placements in public or private agencies are provided quality services that protect the safety and health of the children;

42 U.S.C. § 671(a)(16) and (22).

42 U.S.C. § 675(1) defines the requirements for a "case plan" and § 675(5) defines the requirements for a "case review system." 42 U.S.C. § 675(1) and (5).

Defendants argue that §§ 671(a)(22) and (16) and 675(1) and (5) do not provide a private right of action under 42 U.S.C. § 1983. Section 1983 provides a private cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. Section 1983 is generally available to remedy violations of federal statutes. *See Yvonne L.*, 959 F. 2d 886 (*citing Maine v. Thiboutot*, 448 U.S. 1, 4 (1980)). However, recovery under §1983 action is foreclosed if (1) the federal statute does not create enforceable rights, or (2) Congress specifically has foreclosed private enforcement of the statute. *Yvonne L.*, 959 F. 2d 886 (*citing Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498, 509 (1990)).

Three principal factors determine whether a statutory provision creates a privately enforceable right. *Blessing v. Freestone*, 520 U.S. 329, 340 (1997). These factors are: (1) whether the plaintiff is an intended beneficiary of the statute; (2) whether the plaintiff's asserted interests are not so vague and amorphous as to be beyond the competence of the judiciary to enforce; and (3) whether the statute imposes a binding obligation on the State. *Id.* (*citing Wilder v. Virginia Hospital Assn.*, 496 U.S. at 509).

In *Suter v. Artist M.*, 503 U.S. 347 (1992), the Supreme Court held that § 671(a)(15) does not create a private cause of action. In 1994, Congress enacted of 42 U. S. C. § 1320a-2 which

overturned portions of the *Suter* decision. That statute states in relevant part:

> In an action brought to enforce a provision of this chapter, such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contexts of a State plan. This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in Suter v. Artist M., 112 S. Ct. 1360 (1992), but not applied in prior Supreme Court decisions respecting such enforceability . . . .

The amendment clearly indicates that Congress did not intend to limit or expand the grounds for determining whether any of the subsections could provide a private cause of action. Since the legislation is clearly not intended to affect the force of previous decisions on this issue, I conclude that the amendment was not intended to overturn pre-*Suter* decisions such as *Wilder* and *Yvonne L. See Stanberry v. Sherman*, 75 F. 2d 581, 584 (10th Cir. 1996).

Plaintiff asserts that she is entitled to recover damages under § 1983 for Defendants' violation of §§ 671(a)(16) and (22); 675(1); and 675(5) of the AACWA. The Tenth Circuit has held that Congress clearly intended the AACWA to benefit children in state foster care. *See Yvonne L.*, 959 F. 2d at 887. Also in *Yvonne L.,* the Tenth Circuit found that the clear language of § 671(a) makes its provisions mandatory upon participating state plans. *Id*. at 888. Thus, §§ 671(a)(16) and (22) satisfy the first two *Blessing* factors. *See Blessing*, 520 U.S. at 340.

With respect to the third factor, the *Yvonne L.* Court held that individual causes of action may be appropriate, depending upon the particular section or violation involved and did not decide whether such an action would include a right to monetary damages. *See Yvonne L.*, 959 F. 2d at 888. The subsection at issue in *Yvonne L.*, § 671(a)(10), references "standards of national organizations concerned with standards for such institutions or [foster] homes." *Yvonne L.*, 959 F. 2d at 888. The

29

Tenth Circuit held that the language of § 671(a)(10) by itself does not support such a cause of action because its language is too vague and amorphous. *Id*. The question is thus whether the language of §§ 671(a)(16) and (22); 675(1); and 675(5) meets the requirements of the third *Blessing* element.

Section 671(a)(16) provides for the development of a case plan for each child receiving foster care maintenance payments and for a case review system with respect to each such child. Section 671(a)(22) requires the State to develop and implement standards to ensure that children in foster care placements are provided quality services that protect the safety and health of the children. Sections 675(1) and (5) are definitions. The language of Sections 671(a)(16) and (22) and 675(1) and (5) is similar to the language of § 671(a)(10), which the Tenth Circuit found too vague and amorphous to support a cause of action under §1983. *Yvonne L.*, 959 F. 2d at 888. Thus, these Sections do not create a private cause of action under §1983. Summary judgment should be granted in favor of Defendants, and against Plaintiff, on Count II.

> **d.** **Whether Plaintiff's state tort claims should be dismissed due to lack of federal jurisdiction and sovereign immunity.**

The Governmental Defendants argue that Plaintiff's state tort claims against them should be dismissed based on sovereign immunity. First, they assert that New Mexico's statutory waivers of sovereign immunity do not extend to suits in federal court, relying on *Ward v. Presbyterian Health Care Services*, 72 F. Supp. 2d 1285, 1294 (D. N.M. 1999). Plaintiff counters that Defendants have waived this argument by invoking a ruling from this Court. Due to the inapplicability of Plaintiff's asserted statutory waivers, discussed *infra*, I do not reach the issue of whether Defendants waived the *Ward* argument.

Defendants argue that the New Mexico Tort Claims Act, NMSA § 41-4-1, *et seq.*, does not

waive sovereign immunity with respect to Plaintiff's state law claims asserted against them.  Plaintiff alleges the following state law claims against the Governmental Defendants: breach of duty to protect (Count V), and negligent supervision, negligent entrustment and negligent failure to warn (Count VI). (Doc. 44.)  Plaintiff claims that sovereign immunity is waived by NMSA §§ 41-4-9 and 41-4-10.

Plaintiff's asserted statutory waivers of immunity are inapplicable.  Sections 41-4-9 and 41-4-10 apply to the operation of hospital-like facilities and the providing health care services.  The Governmental Defendants were not engaged in the operation of MVH and were not providing health care services.  Thus, NMSA §§ 41-4-9 and 41-4-10 do not apply to Plaintiff's state law claims as contained on Count V and Count VI.

Even if the waivers fit the state law causes of action alleged, they are not applicable to the Governmental Defendants.  Section 41-4-9 provides that immunity "does not apply to liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation of any hospital, infirmary, mental institution, clinic, dispensary, medical care home or like facility."  NMSA 41-4-9. A social worker's placement of a child in a foster home is not the operation of a hospital or "like facility" within the meaning of Section 41-4-9.  *M.D.R. v. State ex rel. Human Services Dept.*, 114 N.M. 187, 190, 836 P.2d 106, 109 (Ct. App. 1992)  Similarly, Section 41-1-10 provides that immunity "does not apply to liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees licensed by the state and permitted by law to provide health care services while acting within the scope of their duties of providing health care services."  NMSA § 41-4-10.  A social worker's placement of a child in a foster home is not  the provision of "health care services" within the meaning of Section 41-4-10. *M.D.R.*, 114 N.M. at 189,

836 P.2d at 107.  Thus, sovereign immunity has not been waived with respect to the Governmental Defendants' actions.

Counts V and VI are asserted against the Governmental Defendants solely in their official capacities.  As there is no waiver of sovereign immunity, the Governmental Defendants are immune from suit with respect to the state law tort claims.  Thus, the Governmental Defendants are entitled to summary judgment on Counts V and VI.

**WHEREFORE,**

**IT IS ORDERED** that Defendant Deborah Hartz, Karen Zarate, Susan W. Drake, Cecilia Rosales and Children Youth and Families Department's Motion for Summary Judgment (Doc. 82), filed June 5, 2001, is hereby **GRANTED**.

**IT IS FURTHER ORDERED** that Summary Judgment shall issue in favor of Defendants Deborah Hartz, Karen Zarate, Susan W. Drake, Cecilia Rosales and Children Youth and Families Department and against Plaintiff.

_____

**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**